## Computations of Public Utility Assessments

MORGAN, Deputy Attorney General, February 19, 1940. —This department is in receipt of your letter of January 26, 1940, in which you request our opinion upon the following:

"1. May the Pennsylvania Public Utility Commission calculate gross intrastate revenues, under section 1201(b) of the Public Utility Law, by estimating the gross intrastate revenues of utilities failing to file reports of revenue when requested to do so?

"2. May the Pennsylvania Public Utility Commission, under section 1201 (b) of the Public Utility Law, make a provisional assessment against all utilities other than motor carriers and subsequently make a final assesment against all utilities, including motor carriers?"

Section 1201 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended by the Act of September 28, 1938, P. L. 44, 66 PS §1461, provides, in part, as follows:

"Section 1201. Assessment of Regulatory Expenses Upon Public Utilities.— (a) Whenever the commission, in the performance of its duties under this act, shall conduct an investigation of the affairs of any public utility, involving an examination of the records or facilities thereof, such public utility shall pay to the commission a sum equal to the salaries paid to commission employes while engaged in such examination, together with such traveling and subsistence expenses of said employes as may be directly attributable to such examination: Provided, however, That the amount so paid by any public utility during any one calendar year shall not exceed one per centum of the gross intrastate operating revenues thereof during its next preceding fiscal year.

"(b) Periodically, the commission shall determine the aggregate of its expenditures, less (1) amounts assessable under paragraph (a) hereof; (2) expenditures for equipment, furniture, and machinery; (3) the estimated cost of regulating municipal corporations furnishing public service; and (4) the estimated cost of regulating contract carriers by motor vehicle. The remaining balance shall be so allocated to the groups of public utilities furnishing the various types of service that each group shall have allocated to it—(1) an amount equal to the expenditures of the commission directly attributable to the regulation of that group; and (2) an amount equal to such proportion of the expenditures of the commission not directly attributable to any group, as the gross intrastate operating revenues of the group bear to the total

gross intrastate operating revenues of all public utilities: Provided, however, That there shall be deducted from the allocations to each group an amount equal to the fees paid to the commission by the public utilities in such group under the provisions of sections twelve hundred two and twelve hundred three of this act. Every public utility shall then pay to the commission an amount equal to such proportion of the allocation to its group as the gross intrastate operating revenues of the public utility bear to the total gross intrastate operating revenues of the group."

By virtue of the aforesaid provisions a system is established whereby it is at least theoretically possible to recover for the Commonwealth nearly all of the expense incident to the administration of the Public Utility Law from all public utilities in the Commonwealth. For example, you inform us that in the year 1939 the cost of administration was $1,150,971. Of this amount the sum of $473,475 has already been collected in the form of fees, etc.; $35,000 thereof is represented by unrecoverable items such as cost of equipment, regulation of municipal corporations furnishing public service, and the costs of regulation of contract carriers. The balance of $642,496 must, therefore, be collected from the various public utility groups which it is the function of the commission to regulate. A part of this amount is directly attributable to a particular group of public utilities (such as, for example, salaries of electrical engineers chargeable to electric companies) and can be billed directly to the company or group involved. The balance, representing indirect charges, must be allocated to the various public utility groups in the relation that the gross intrastate operating revenue of each group bears to the aggregate comparable revenue for all groups: sec. 1201(b), supra.

In order to make this calculation it is obviously necessary to know the intrastate revenue of all public utilities in the Commonwealth and, you inform us, an attempt has been made to collect this information by requiring

each public utility to submit a form containing its gross intrastate revenue for the years ending December 31, 1938, and December 31, 1939. Most of the utilities responded satisfactorily except the motor carrier group; and of these approximately only one half have filed returns. This is largely due to the fact that most of the delinquents are small operators, ofttimes owning but a single truck, who are not familiar with record keeping. The cost of trying them for delinquency and canceling their certificates of public convenience would in most cases exceed the amount of the assessment ultimately collectible and, in all probability, it will be a considerable time before the commission succeeds in ascertaining the desired information. Rather than longer deprive the general fund of the Commonwealth of the contribution from the other groups which have already submitted the required information, the commission desires to be informed whether it may legally calculate the gross intrastate revenue of all the groups by ascribing to the motor carriers a hypothetical figure representing their total intrastate revenue. To arrive at this figure the commission would estimate the revenue of motor carriers by a study covering the annual reports of motor carriers filed with the commission in 1936 and 1937, an adjustment for the increased number of small carriers, and a sampling of the reports filed in response to the request for 1938 and 1939 revenues. The estimated revenue of the motor carrier group would purposely be calculated at the highest possible figure and there would be deducted temporarily from the indirect charges an amount equal to the proportion of this estimated revenue figure compared with the total revenue of all utilities. The balance of indirect charges would then be prorated among other groups of utilities on the revenue basis and bills mailed to the individual companies in each group other than motor carriers. This, it is estimated, would allow the major portion of the assessment to be collected forthwith. For the present no assessment would be made against the motor carrier

group. When all motor carriers have finally responded with the desired information, or when sufficient information has been gathered to permit the computation of revenues of nonreporting individual carriers by averaging revenues per truck of carriers who have filed reports, the indirect charges will be recalculated and the exact assessment determined for all companies. The motor carriers will then receive their bills for the general assessment for the first time, and all other public utilities will receive bills for such additional amounts as are necessary to make up the proper proportion of the indirect charges which they should bear. In order to insure that the other groups are not overbilled in the first instance, it is proposed to estimate the motor carrier revenue at the highest figure. This will cause the original charges to be assessed against other public utilities to be lower than the actual amount due.

In enacting the statute here under discussion the legislature conferred upon the commission the power to assess upon all public utilities the cost to the Commonwealth of their regulation. It has long been settled that a State may, in the exercise of its police power, provide for the supervision and regulation of public utilities; may delegate this power to a commission; and may exact the cost of such supervision and regulation from the utilities concerned and allocate the exaction among the members of the affected class or classes: Charlotte, Columbia & Augusta R. R. Co. v. Gibbes, 142 U. S. 386, 35 L. ed. 1051 (1892). The only requisites would seem to be that the assessment be reasonable and that the cost upon which it is computed be incurred solely in the exercise of that power which has been delegated, viz., the supervision and regulation of the utilities affected. If the amount assessed is clearly excessive and is based, in part, upon the cost of the regulation or supervision of any matter or thing not connected with public utilities, no part of the assessment may be collected: D. E. Foote & Co., Inc., v. Stanley, etc., 232 U. S. 494, 58 L. ed. 698 (1914); Great Northern Ry.

Co. v. Washington, 300 U. S. 154, 81 L. ed. 573 (1937). So long, therefore, as the assessment made by the commission is based upon the actual, reasonable cost of the regulation and supervision of the public utilities within the Commonwealth we do not hesitate to hold that the provision permitting it does not contravene either the Constitution of this Commonwealth or of the United States.

The answer to your inquiry, therefore, must be determined by reference to the pertinent provisions of section 1201(b) of the Public Utility Law, as amended, supra. Therein it is provided that "The remaining balance [expenditures] shall be so allocated to the groups of public utilities furnishing the various types of service that each group have allocated to it—(1) an amount equal to the expenditures of the commission directly attributable to the regulation of that group; and (2) an amount equal to such proportion of the expenditures of the commission not directly attributable to any group, as the gross intrastate operating revenues of the group bear to the total gross intrastate operating revenues of all public utilities. . . . Every public utility shall then pay to the commission an amount equal to such proportion of the allocation to its group as the gross intrastate operating revenues of the public utility bear to the total gross intrastate operating revenues of the group."

There is thereby clearly set forth the formula for the computation of the amount of the assessment each public utility will ultimately be required to pay. There is, however, no provision regulating the manner in which the gross intrastate operating revenue of any specific public utility or group is to be computed in the absence of specific information as to the amount of such revenue furnished by that public utility or group. Since the formula is useless without one of its constituent parts, it is only fair to assume that the legislature intended that the commission should, in the exercise of its sound discretion and judgment, supply the same, when necessary, by whatever means it deems practicable.

The system you now seek to employ seems to us to be eminently reasonable. The legislature has provided for the regulation and supervision of public utilities. It has required that the bulk of the resulting financial burden be lifted from the shoulders of the citizens and placed where it rightfully belongs—on the public utilities. Although an appropriation is made each fiscal biennium in anticipation of the payment of the current expenses of the commission, it is obviously the legislative intent that there should be a steady return, throughout the biennium, to the general fund as a result of the collection of fees and assessments. It would defeat the legislative intent, therefore, to permit one group of utilities to interfere, or even prevent, the continuous and steady return of the money to which the Commonwealth is entitled. And it is not that a hardship will be worked upon any of the public utility groups under the proposed plan. As we understand it, the commission proposes to determine its expenditures retrospectively. It is thereby possible to determine, to the penny, the extent to which the Commonwealth is entitled to be reimbursed. The figures can be justified and are open to inspection by an interested carrier: section 1201 (*f*). It will be a comparatively simple matter to determine their reasonableness and accuracy. Furthermore, the public utilities originally billed—that is, all but the motor carrier group—will be required, at this time, to pay *less* than the actual amount which they owe the Commonwealth (and we know of no reason why the commission cannot send a supplemental bill after the exact amount due is determined). On the other hand, the motor carriers, even those who have filed a report, are required to pay nothing until such time in the future as the actual amount of the motor carrier revenues are determined. As we see it, each public utility group is benefited rather than harmed.

We are of the opinion, therefore, and you are advised:

1. That the Public Utility Commission may calculate gross intrastate revenues, under section 1201 (*b*) of the

Public Utility Law, supra, by estimating the gross intrastate revenues of utilities failing to file reports of revenue when requested so to do.

2. That the Public Utility Commission, under section 1201(b) of the Public Utility Law, may make a provisional assessment against all utilities other than motor carriers and subsequently make a final assessment against all utilities, including motor carriers.